JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant Towanda Langford appeals from a judgment of conviction entered on one count of robbery that occurred when she and her cousin, codefendant Tawanda Mormon, assaulted the victim and took money from her. She argues that the court lacked sufficient evidence to find her guilty of robbery because the theft of money occurred as an afterthought following the assault, and that the court's judgment of conviction was against the manifest weight of the evidence. Neither argument has merit, so we affirm.
 I {¶ 2} In her first assignment of error, Langford argues that the state presented insufficient evidence from which the court could find that she committed robbery. She maintains that there was no evidence from which the court could find that she inflicted physical harm on the victim while committing a theft offense.
 {¶ 3} When reviewing a claim that there is insufficient evidence to support a conviction, we view the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 4} The elements of robbery as charged in this case are set forth in R.C. 2911.02(A)(2): "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or *Page 4 
threaten to inflict physical harm on another[.]" Theft occurs under R.C.2913.02(A)(1) when, while acting with purpose to deprive the owner of property or services, the defendant knowingly obtains or exerts control over the property without the consent of the owner. "Physical harm" is defined in R.C. 2901.01(A)(3) as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."
 {¶ 5} The victim testified that she and Langford were both involved with the same man. Although Langford had an ongoing 10-year relationship with this man, the victim had given birth to his child just two weeks before the robbery. The victim agreed that she and Langford were not on friendly terms. They both expressed an animosity toward the other and had filed charges accusing the other of breaking windows at their respective apartments.
 {¶ 6} The victim said that on the day of the robbery, she had been shopping and paying bills at a convenience store. She carried $600 in cash in $20 bills, all of which she placed inside her bra. As she exited the store, the victim saw Langford standing by her car. As she approached her car, Langford said, "Bitch, what's up." The victim ignored Langford and started to enter her car, but Langford sprayed her with mace. The victim exited her car and began fighting with Langford. By this time, Langford's cousin had approached and joined the fight. The victim said that she was hit with "something" that caused her to bleed from her nose and forehead. As the three fought, some of the money came loose from the victim's bra and landed on the ground. Langford saw the money on the ground and, saying "[b]itch, we need *Page 5 
this," she picked it up and put it in her pocket. A store employee broke up the fight and Langford drove away with her cousin.
 {¶ 7} The victim called the police. A tape recording of the 911 call showed that she told the police that Langford carried a gun. At trial, the victim admitted that she did not actually see a gun, but assumed that she had been struck by a gun because of how her face was bleeding.
 {¶ 8} Knowing where Langford lived, the victim followed her and the cousin. The police met the victim at Langford's apartment complex and confirmed that she had been sprayed with mace and was bleeding. They described her demeanor as "hysterical." The victim specifically told the police that she was missing $400, a sum made up entirely of $20 bills. The police detained Langford and her cousin, read them theirMiranda rights and then asked them what happened. Langford told the police that she had an "on-going situation" with the victim, that they had fought and that the victim had used pepper spray on her. One of the officers recalled that Langford did not smell of mace, nor were her clothes ripped or disheveled. The police also found a can of pepper spray under Langford's car. The police asked both Langford and her cousin whether they had any money or anything else on their person. Both women replied in the negative, and a female officer who searched Langford and her cousin found nothing of note on them. As Langford was placed in the back of a police car, an officer said that he made a "mental note" that Langford had a hole in the crotch area of her pants. *Page 6 
 {¶ 9} Langford was taken to the police station. At the booking window, the police again asked her if she was carrying money of any kind on her person. The officer did not recall if Langford gave a reply, but he recalled that neither Langford nor her cousin exchanged money at the booking window. Although Langford twice informed the officers that she had to use the restroom, the officers told her that she would be subjected to a search beforehand. An institutional guard searched Langford, who had by this time become incontinent, and found a soiled wad of cash in the crotch area of her pants. There were twenty $20 bills, one $100 bill and one $50 bill.
 {¶ 10} Langford testified that she owned the money recovered from her. She said that on the day of the robbery, she collected money owed to her by a friend who had temporarily employed her. The friend paid her $600, consisting of one $100 bill, two $50 bills, and twenty $20 bills. After collecting the money, she stopped at a gas station to purchase gasoline and snacks. She said she used one of the $50 bills to pay for her purchase. She and her cousin then stopped at the convenience store to buy cigarettes and soft drinks. Langford said she stood outside the store counting her money when the victim approached her and said, "[w]hat's up now, bitch." She waved off the victim and then felt a burning sensation on her face and realized that she had been sprayed with mace. She apparently put the money in her pocket and pulled out her own can of mace. As she and the victim fought, the money fell out of her pocket. She said she picked up the majority of her money and that the store *Page 7 
employee who broke up the fight collected some more of the money and handed it to her. Langford said that she put the money back in her pocket.
 {¶ 11} When the police intervened, Langford claimed that when asked, she told them she had money on her person. The police did not, however, ask to see the money, but instead suggested that she give it to the victim. Langford refused. She said that she became incontinent as she was escorted into the police station, but that the money remained in her pocket and could not have become wet in the manner suggested by the state.
 {¶ 12} Langford's primary argument is that evidence failed to show that her primary purpose was to commit a theft offense. She maintains that the theft occurred merely as an afterthought to a simple misdemeanor assault and hence did not rise to the level of a robbery.
 {¶ 13} We reject Langford's argument. The state presented evidence establishing the physical harm element of the offense by showing that, in addition to hitting the victim, Langford had sprayed mace in the victim's eyes and struck her with a hard object that caused her to bleed from her nose and forehead.
 {¶ 14} The victim's testimony also established the theft element of the offense by showing that $400 in twenty-dollar bills had been stolen from her and recovered from Langford. The state established the contemporaneous nature of the theft and physical injury with testimony from the victim that Langford took the money as she and her cousin continued to fight with the victim and inflict physical harm upon her. *Page 8 
The victim's testimony showed that the money fell out of her bra as she fought with Langford and that Langford took the money as the fight continued. Langford's own testimony tended to corroborate this fact, as she testified that "[w]ell, I picked up the majority of my money and as the fight was ending we was leaving and a guy said here, sweetheart, here's your money." By her own admission, she had taken some of the money as the fight was ongoing. Viewing the evidence in a light most favorable to the state, we find that a reasonable trier of fact could find that Langford deprived the victim of her cash while inflicting physical harm upon her.
 II {¶ 15} Langford next argues that the judgment of conviction is against the manifest weight of the evidence. She points to the victim's admitted acknowledgment that no gun had been used during the commission of the offense and claims that the victim had every incentive to lie about each essential detail of the case.
 {¶ 16} The manifest weight of the evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Otten
(1986), 33 Ohio App.3d 339, 340. The use of the word "manifest" means that the trier of fact's decision must be plainly or obviously contrary to all of the evidence. *Page 9 
This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." State v.Antill (1964), 176 Ohio St. 61, 67.
 {¶ 17} Our review of the evidence convinces us that the court did not lose its way by finding Langford guilty of robbery. The victim gave consistent testimony regarding the nature of the assault upon her and the theft of her money. The police corroborated her physical injuries and confirmed that she smelled of mace. This testimony was consistent with evidence that the police found a can of mace beneath the car driven by Langford and her cousin. The victim also gave very credible testimony regarding the exact amount of money, in $20 bills, that was taken from her. Importantly, the police recovered that same number of $20 bills from Langford, who had obviously been hiding the money in her pants.
 {¶ 18} Langford did not give credible testimony. Although she claimed that the victim initiated the fight by spraying her with mace, the police were unable to find any traces of mace on Langford or her clothing. The police remarked that unlike the victim, Langford appeared to be untouched by the incident, thus suggesting that she and her cousin had provoked the fight. The evidence also showed that Langford lied about possessing the money, as she twice denied having any money in her possession, but was later found to have the exact amount of money taken from the *Page 10 
victim in the crotch of her pants. There was testimony from an officer that he noticed a hole in the crotch area of Langford's pants, and the placement of the money in the crotch area of the pants suggested that Langford placed it there to hide it from the police. Langford's testimony that she kept the money in her pocket at all times and that it could not have been soiled when she became incontinent was simply unbelievable given the very graphic testimony by the institutional guard who found the money and the police officer who had the task of counting the money after it had been recovered from Langford.
 {¶ 19} We find no merit to Langford's assertion that the victim lacked credibility because she fabricated the existence of a gun in her 911 call to the police. The victim explained that she had been struck by a hard object and believed that it must have been a gun. Although the victim conceded that she did not actually see a gun during the robbery, the trauma to her face was manifest, thus corroborating her assertion that she had been struck by a hard object. Apart from this one inconsistency, the victim's version of events remained consistent with other evidence uncovered by the police. The assigned errors are overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. *Page 11 
The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ANN DYKE, J., and MARY J. BOYLE, J., CONCUR. *Page 1